**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HONORABLE PAULA A. PATRICK | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | **CIVIL ACTION NO. 2:22-cv-01520 - JP** |
| | : | |
| THE DAILY BEAST COMPANY LLC, | : | |
| *et al.,* | : | |
| Defendants. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

Respectfully submitted,

**THE BEASLEY FIRM, LLC**

James E. Beasley, Jr
Dion G. Rassias
THE BEASLEY BUILDING
1125 Walnut Street
Philadelphia, PA  19107-4997
T: (215) 592-1000
F: (215) 592-8360
Jim.Beasley@beasleyfirm.com
Dion.Rassias@beasleyfirm.com
*Attorneys for Plaintiff*,
*The Honorable Paula A. Patrick*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  COUNTER-STATEMENT OF PERTINENT PROCEDURAL HISTORY . . . . . . . . . . . . . . 1

III.  PERTINENT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A. Pertinent Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

1. On the Law of Defamation/False Light . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

a. The Boundaries and Interplay Between Federal and State — Here,
Pennsylvania — Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

b. Defamatory Meaning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

c. Actual Malice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

1). On Defendants' Blatant Misrepresentations Regarding a
Heightened Standard in Defamation-by-Implication Cases . . . . . . 10

B. The Plain-Meaning Sting of the Publication is Actionably Defamatory . . . . . . . . . . . . . 13

C. Plaintiff Has More Than Amply Pleaded Facts to Establish Actual Malice . . . . . . . . . . . 19

5. Again, Defendants' Purported "Reliance" on Sources — Here, Prior Articles by
Other Media Outlets — Far from Precluding Actual Malice, Further *Proves* It . . . . 21

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CERTIFICATE OF SERVICE

i

## <u>TABLE OF AUTHORITIES</u>

**Page**

<u>Case-Law</u>

<u>Am. Future Sys., Inc. v. Better Bus. Bureau</u>, 923 A.2d 389 (Pa. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 10

<u>Anderson v. Liberty Lobby</u>, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

<u>Banonis v. Roney</u>, 2023 Pa. Super. Unpub. LEXIS 1060 (Pa. Super. May 1, 2023) . . . . . . . . . . . . . 20

<u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..3, 9

<u>Bromhall v. Rorvik</u>, 478 F. Supp. 361, 367 (E.D. Pa. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>Buckley v. Littell</u>, 539 F.2d 882 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

<u>Celle v. Filipino Reporter Enterprises, Inc.</u>, 209 F.3d 163 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . 12

<u>Christopher v. American News Co.</u>, 171 F.2d 275 (7th Cir. 1948) . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

<u>Dunlap v. Philadelphia Newspapers, Inc.</u>, 448 A.2d 6 (Pa. Super. 1982) . . . . . . . . . . . . . . . . . . . . . 19

<u>Dunn v. Gannett New York Newspapers, Inc.</u>, 833 F.2d 446 (3d Cir. 1987) . . . . . . . . . . . . . . . . 19, 23

<u>Franklin Prescriptions, Inc. v. The New York Times Co.</u>, 267 F. Supp.2d 425 (E.D. Pa. 2003) . . . . . 13

<u>Graboff v. The Colleran Firm</u>, 744 F.3d 128 (3d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

<u>Harte-Hanks Communications v. Connaughton</u>, 491 U.S. 657 (1989) . . . . . . . . . . . . . . . . . . . 2, 13, 19

<u>Herbert v. Lando</u>, 441 U.S. 153 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>In re Asbestos Prods. Liab. Litig. (No. VI)</u>, 822 F.3d 125, 133-134 (3d. Cir. 2016) . . . . . . . . . . . . . . 3

<u>Jankovic v. Int'l Crisis Group</u>, 494 F.2d 1080 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

<u>Joseph v. The Scranton Times, L.P.</u>, 129 A.3d 404 (Pa. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

<u>Kaelin v. Globe Communs. Corp.</u>, 162 F.2d 1036 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

<u>Kendall v. Daily News Publ'g Co.</u>, 716 F.3d 82 (3d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . 13-15

<u>Krajewski v. Gusoff</u>, 53 A.3d 793 (Pa. Super. 2012),
<u>appeal dismissed</u>, 84 A.3d 1057 (Pa. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2-5, 13

Lavin v. New York News, Inc., 757 F.2d 1416 (3d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Liberty Lobby v. Anderson, 746 F.2d 1563, 1573 (D.C. Cir. 1984),
  reversed on other grounds in Anderson v. Liberty Lobby, 477 U.S. 242 (1986) . . . . . . . . . . . . . . 21

Liberty Lobby, Inc. v. Dow Jones & Co., 838 F.2d 1287 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . 13

MacElree v. Philadelphia Newspapers, 674 A.2d 1050 (Pa. 1996) . . . . . . . . . . . . . . . . . 1, 5, 6, 11, 19

Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072 (3d Cir. 1985) . . . . . . . . . . . . . . . . . 13

Mayer v. Belichick, 605 F.3d 223 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

McCafferty v. Newsweek Media Group, 955 F. 3d 352 (3d. Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . 1, 2

McDowell v. Paiewonsky, 769 F.2d 942 (3d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9

McGovern v. City of Philadelphia, 544 F.3d 114 (3d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Mikulak v. Edwards, 2016 U.S. Dist. LEXIS 120797 *13, 14 (M.D. Pa. 2016) . . . . . . . . . . . . . . . . . 2

Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 20

Moore v. Vislosky, 240 Fed. Appx. 457 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 13, 24

Morgan v. Bulletin Co., 85 A.2d 869 (Pa. 1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

New York Times Co. v. Sullivan, 374 U.S. 254 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Norton v. Glenn, 860 A.2d 48 (Pa. 2004), cert. denied, 544 U.S. 956 (2005) . . . . . . . . . . . . . . . . . . 10

Ralston v. Garabedian, 2022 U.S. Dist. LEXIS 153789 (E.D. Pa. Aug. 26, 2022) . . . . . . . . . . . . . 23

Santillo v. Reedel, 634 A.2d 264 (Pa. Super. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Schiavone Const. Co. v. Time, Inc., 847 F.2d 1069 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Smith v. Wagner, 588 A.2d 1308 (Pa. Super. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Solano v. Playgirl, Inc., 292 F.3d 1078 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Sprague v. ABA, 2003 U.S. Dist. LEXIS 15518 (July 21, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

Sprague v. ABA, 2001 U.S. Dist. LEXIS 18707 (E.D. Pa. Nov. 14, 2001) . . . . . . . . . . . . . . . . . 11, 15

Sprague v. Walter, 543 A.2d 1078 (Pa. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Sprague v. Walter, 656 A.2d 890 (Pa. Super. 1995), appeal denied, 670 A.2d 142 (Pa. 1996) . . . . . . 12

St. Amant v. Thompson, 390 U.S. 727 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13

Tavoulareas v. Piro, 817 F.2d 762 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Thomas Merton Ctr. v. Rockwell Int'l Corp., 442 A.2d 213 (Pa. 1981) . . . . . . . . . . . . . . . . . . . . . 19

Tucker v. Fischbein, 237 F.3d 275 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9

Weaver v. Lancaster Newspapers, Inc., 926 A.2d 899 (Pa. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 23

## Constitutional Provisions

Pennsylvania Constitution, Article I, § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## Rules

Fed. R. Civ. Pro. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 9

## Miscellaneous

Restatement (Second) of Torts § 563, comment d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Restatement (Second) of Torts § 652E, comment b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11

Restatement (Second) of Torts § 611, comment f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

The American Heritage Collegiate Dictionary (Third Ed. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## I.    **INTRODUCTION**

In this false light/invasion of privacy claim, it has been pled and is clear that these defendants created the at-issue article and its provably false claim that Judge Patrick was "Q'Anon Linked" in a calculated way to maliciously harm her reputation as a jurist and in the community.   And it was done so, as is also pled, because these defendants disagree with her politics and her decision in the Philadelphia Columbus Statute issue.    This predicate is textbook for a proper claim for False Light/Invasion of Privacy unrestricted by the First Amendment, as held in Krajewski v. Gusoff, 53 A.3d 793, 809 (Pa. Super. 2012), appeal dismissed, 84 A.3d 1057 (Pa. 2014):

> The trial court concluded, in the first instance, that the extension of First Amendment protections effectively undermines Krajewski's false light claims, as she could not prove falsity and actual malice. Trial Court Opinion, 9/29/11, at 27 (citing Snyder, supra). We disagree. Proof of false light does not devolve on evidence that every single statement is itself false, but rather that the scenario depicted created a false impression, even if derived from true statements.

The Superior Court also held, relying on MacElree that, at this stage of litigation, that the implication of malice in the pleadings was sufficient to survive a demurrer:

> At this procedural juncture, we cannot be certain whether it was the Newspapers' intent to foster these impressions, nor can we gauge the extent to which the editors acted with reckless disregard for the truth.  Such certainty is not consonant with the judicial role at this point in the litigation. Cf. MacElree, 674 A.2d at 1056 (Cappy, J., concurring). Nevertheless, to the extent the editorial staff of the Northeast Times may have orchestrated the Opinion page to create arguably false impressions, we find the implication of actual malice at least sufficient to survive preliminary objections in the nature of a demurrer.

Although Krajewski was the Pennsylvania Superior Court's most recent statement on the depth and breadth of Pennsylvania False Light/Invasion of Privacy law, relied upon this court in Graboff v. The Colleran Firm, 744 F.3d 128 (3d Cir. 2013) and McCafferty v. Newsweek Media Group, 955 F. 3d. 352 (3d. Cir. 2020), it is **nowhere** in the defendants' Motion of Memorandum of Law.  That absence should not go unnoticed by this Honorable Court, because the circumstances behind the Patrick false

1

light claim have numerous parallels with the circumstances behind <u>Krajewski</u>, and quite different than <u>McCafferty</u>, which involved an article containing "derogatory opinions based upon disclosed facts." <u>Id.</u>, 955 F.3d 355.  Plaintiff's Amended complaint is not, as the defendants claim, simply full of "buzzwords," attempting to require the plaintiff to plead evidence as opposed to the sufficiency of the pleadings.  At the Rule 12 stage of this litigation, that is improper and arguing an absence of evidence "not a proper consideration in a motion to dismiss" in a false light/invasion of privacy case.   <u>See</u> <u>Mikulak v. Edwards</u>, 2016 U.S. Dist. LEXIS 120797 *13, 14 (M.D. Pa. 2016).   The pleadings make plain that the defendants not only knew that the assertions in their article and headline affirmatively linking Judge Patrick to Q'Anon were unsupported and unsupportable, but they purposely refused to conduct any investigation into this alleged linkage (all of their hyperlinked sources failed to support that allegation) and further withheld other facts known to them that refute it.  Consistent with <u>Harte-Hanks Communications v. Connaughton</u>, 491 U.S. 657, 668 (1989), "recklessness may be found," for example, "where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." <u>Id</u>. at 688 (<u>quoting</u>, <u>St. Amant</u>, 390 U.S. at 732) (addressed <u>infra</u>). In the same vein it is apparent that, if the alleged sources provide no support to claim Judge Patrick is linked to Q'Anon, to then report that these same sources do support that claim is more than mere negligent reporting and provides more than the "implication" of malice required by the caselaw.   Given that the actual sources of the article provide zero support for the provably false claim that Judge Patrick was/is "Q'Anon Linked" they now resort, via their arguments in and exhibits to their Motions to Dismiss, to include other articles not relied upon by them to attempt to create a Q'Anon link when they know there is none. The defendants' filings have repeatedly admitted that their only sources for the at-issue article come from the articles hyperlinked within its body.  <u>See</u> Defendants' Motion to Dismiss at 3: "[T]he operative facts as set forth in the Amended Complaint are not in dispute: Defendants published an

article about Judge Patrick's high-profile ruling in the Columbus statue case and described her primary election connections to QAnon, relying solely on news reports in reputable Philadelphia publications, which were hyperlinked for readers to visit themselves."   The hyperlinked articles are attached collectively as "exhibit "A"; **nowhere** in any of these articles is Q'Anon mentioned (let alone any alleged "linkage" between that organization and Judge Patrick) and therefore they cannot be the alleged "source" of the defendants' attack on Judge Patrick.   That significant omission now has the defendants attempting to inject irrelevant, extrinsic evidence in their Motion to Dismiss.   That is plainly improper and the Court should disregard their attachments or references to Judge Patrick's statements in another lawsuit involving a non-hyperlinked article (see footnote 8, infra).   See In re Asbestos Prods. Liab. Litig. (No. VI), 822 F.3d 125, 133-134 (3d. Cir. 2016) (the district court's reliance on evidence extrinsic to her pleadings to grant the defendants' motion to dismiss was improper).   The Third Circuit identified the district court's error in relying on extrinsic evidence in a Motion to Dismiss:

> This was error because "a court considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) may consider *only* the allegations contained in the pleading to determine its sufficiency."7 *Santomenno ex rel. John Hancock Trust v. John Hancock Life Ins. Co. (U.S.A.)*, 768 F.3d 284, 290 (3d Cir. 2014) (emphasis added) (citing *Pryor v. NCAA*, 288 F.3d 548, 560 (3d Cir. 2002)). And while district courts are not required to accept merely conclusory factual allegations or legal assertions, *see, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678-79, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), they still must accept as true all plausible factual allegations made in the complaint and draw all reasonable inferences in the plaintiff's favor, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 323 (3d Cir. 2014). Accordingly, the District Court's reliance on facts alleged outside of Hassell's amended complaint constitutes a procedural error under Rule 12(b)(6).

Footnote seven of this passage confirms that this rule is not to be narrowly interpreted.   The documents these defendants have improperly attached and referenced are neither integral to nor explicitly relied upon in the complaint.   Third Circuit precedent requires that they must be summarily rejected.   See also Mallard v. Laborers Int'l Union of N. Am. Local Union 57, No. 13-774, 2013 U.S.

Dist. LEXIS 79438 at *10 n.2 (E.D. Pa. June 6, 2013).

It should go without writing that, when one publishes a false and actionably defamatory assertion of fact with no basis **in** fact — indeed, when the publisher is aware there is no basis — this at least constitutes reckless disregard of the truth, that is, actual malice. And see, e.g., Moore v. Vislosky, 240 Fed. Appx. 457, 469 (3d Cir. 2007) (defendant's "awareness that there was no basis for making the specific allegations of wrongdoing that were leveled against" plaintiffs, if proven, would establish actual malice). Defendants' submission at bar goes to great lengths to obscure the simple yet dispositive truth that — as confirmed infra, based on the well-pleaded averments of the Amended Complaint, and the law — this is precisely what happened here. Plaintiff's Amended Complaint provides more than sufficient basis to proceed per the Krajewski false light/invasion of privacy standards for pleading actual malice. What these defendants have done in their article attacking Judge Patrick as being "Q'Anon Linked" was to create a calculated falsehood that is actionable:

> Yet we recognize as well that "constitutional guarantees can tolerate sanctions against calculated falsehood without significant impairment of their essential function." Hill, *385 U.S. at 389-390*. Indeed, First Amendment protections must function in balance with competing interests protected by state tort law, among which the sanctity of reputation and the right to privacy are seminal to our jurisprudence. See Milkovich, *497 U.S. at 22* ("The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being-a concept at the root of any decent system of ordered liberty."). Ultimately, should the finder of fact determine that the overall impression created by the Newspapers' statements was itself a "calculated falsehood" pursuant to *Restatement section 652E*, (notwithstanding the literal truthfulness of individual statements), they would be entitled to no constitutional protection.

> Id, at 807.

## II.   COUNTER-STATEMENT OF PERTINENT PROCEDURAL HISTORY

With respect, specifically, to this Court's March 3, 2023 Order, Plaintiff agrees that:

(1) The Court rejected Defendants' challenge to personal jurisdiction (see, ECF No. 21, ¶¶ 1-7), holding that "the Court may exercise specific jurisdiction over Defendants." Id.

4

at ¶ 7.

(2) The Court It held the publication at issue is capable of defamatory meaning that is not opinion: specifically, that there is a factual assertion that Judge Patrick is a "QAnon-Linked Judge" — as, in fact, the article expressly states — and this is actionable. Id. at ¶¶ 15-17.

(3) The Court held that one specific meaning ascribed to this by Plaintiff as, in fact, *the* plain-English and definitional one — that of 'linked' meaning a part or affiliated with, that Her Honor is a member, adherent, and/or follower of QAnon, that sense — was not sufficiently pleaded in her Complaint to be considered, indeed, was not pleaded at all (id. at ¶ 12), though it is plainly pleaded in her Amended Complaint, as reviewed below. (For the record, Plaintiff still respectfully disagrees this was not pleaded more than amply in her Complaint. See, ECF No. 10-1, ¶ 10. Also see, id. at ¶¶ 1, 7, 8, 13, 22, 23).

(4). The Court held that a further alleged defamatory meaning of the publication — that it also linked that "QAnon-Link" to Judge Patrick's role and ruling in the Columbus statue case highlighted in the same headline and again in the same article, and, hence, also charged her with judicial impropriety and misconduct in office, with abuse of public office — would not be considered either, not because it was not pleaded, but because it was not a plausible reading. ECF No. 21, ¶ 13. (For the record, Plaintiff certainly continues to respectfully disagree with this ruling. As discussed in prior submissions, the alleged defamatory statement considered by the Supreme Court of Pennsylvania in MacElree v. Philadelphia Newspapers, 674 A.2d 1050 (Pa. 1996),[1] accused plaintiff MacElree, the then-D.A. of Chester County, of "electioneering" and described him as "the David Duke of Chester County running for office by attacking Lincoln [University]," an HBCU. See, id. at 1052. In holding this capable of defamatory meaning, the Supreme Court specified that, "in reading the charge that appellant was electioneering and was the David Duke of Chester County, a reasonable person could conclude that this was an accusation that appellant was abusing his power as the district attorney, an elected office, to further racism and his own political aspirations. Such an accusation amounts to a charge of misconduct in office, as appellant alleges in his complaint." Id. at 1054. Also see, id. at 1055 ("[t]he statement we are presented with here could be interpreted as more than a simple accusation of racism.[2] As stated before, the statement could be construed to mean appellant was acting in a racist manner in his official capacity as district attorney. Because there was doubt as to the defamatory

---

[1] "[A]lthough a defamation suit has profound First Amendment implications, it is fundamentally a state cause of action" (Tucker v. Fischbein, 237 F.3d 275, 284 (3d Cir. 2001) (quoting, McDowell v. Paiewonsky, 769 F.2d 942, 945 (3d Cir. 1985)) — here, under the law of Pennsylvania, including Krajewski.

[2] The Court hastened to add that it was not saying accusations of racism alone could never be actionable under Pennsylvania law; in fact, they could. Id.

nature of the complained of language, appellees demurrer should have been overruled."). And what remains striking in comparison to the case at bar is that this actionable reading the Supreme Court held was reasonable and dispositive, under Pennsylvania law, was essentially compelled there by the ascription of the tainted trait, electioneering racism, **to** the holder of public office — the article did not identify any actual case or controversy that was before the D.A. in his public office then. See, id. at 1051-52. Here, there is all that — and more. Here, the tainted trait, that Judge Patrick is a "QAnon-Linked Judge," not only comes with identification of a specific case or controversy that was before Her Honor in her public office — indeed, one itself emblematic of the nation's current 'culture wars' — it literally jams the two together, presenting one following the other in the very headline, "QAnon-Linked Judge Rules in Unhinged War Over Philly's Columbus Statue…" ECF No. 23-1.[3] The case for this same defamatory meaning here is, thus, far greater than that already recognized under Pennsylvania law, as pronounced by the Pennsylvania Supreme Court. Respectfully, this Court erred in its ruling on this issue).

(5) The Court also held that, even assuming it **were** plausible to read the article as making that further link, this would be "non-actionable speculation," that "[t]here is, of course, no objective way to prove what Judge Patrick was thinking when she ruled on the Columbus statue dispute." ECF No. 21, ¶ 14. (For the record, Plaintiff certainly continues to disagree with that ruling, as well. Again, this is a factual assertion of misconduct in office, no more "non-actionable speculation" than that recognized under Pennsylvania law by the Supreme Court of Pennsylvania in MacElree, supra — indeed, for the reasons already discussed, that further link is far more grounded in the text of the article here. Moreover, the question, respectfully, is not so broad as "what Judge Patrick was thinking when she ruled on the Columbus statue dispute." It is, in the first instance, what she was **not** thinking — more precisely, whether the "QAnon-Link[]" asserted by Defendants exists; if not, it could not have played any role in her decision. In any case, as the arguments in Defendants' current Motion will necessitate revisiting some of these same issues, infra, Plaintiff will reserve further discussion of them until then).

(6) Finally, the Court held Plaintiff had not pled any facts that Defendants acted with actual malice (ECF No. 21, ¶¶ 18-19), with regard to which she was given leave to amend, as she has *via* her Amended Complaint, discussed below. (For the record, Plaintiff still respectfully disagrees that her Complaint was in any way deficient in this regard, but will reserve her discussion of actual malice here to rebutting Defendants' meritless challenges to her Amended Complaint on this issue, infra).

---

[3] In fact, that the repeated juxtaposition of these two things, not only in the headline but in the lede, then in successive paragraphs (id.), **does** repeatedly suggest that the (phantom) QAnon link, whether by affiliation or influence explains the ruling is, Plaintiff still believes, not only a plausible reading, the juxtaposition would not otherwise make sense.

### III.   <u>PERTINENT FACTS</u>

Again, Defendants *admit*, as they must, that their publication describes Judge Patrick as a "**a** '**QAnon-Linked Judge**.'" ECF No. 26-1, p. 7.[4] <u>Also</u> <u>see</u>, article at ECF No. 23-1. "Linked" means "[c]onnected, esp. by or as if by links" (The American Heritage Collegiate Dictionary (Third Ed. 1997), p. 790)), while the root "link" in its fundamental sense likewise means an *attachment to* and *part of* something (<u>see</u>, <u>id</u>. at p. 789). <u>And see</u>, Amended Compl., ECF No. 23, at ¶ 7, n. 3. The false assertion that Her Honor is "QAnon Linked" in the headline, and that same "link" repeated in the article (<u>see</u>, ECF No. 23-1), clearly conveys that she is connected with that extremist movement, that she is affiliated with and/or part of it. ECF No. 23, ¶ 7.[5]

Notably, Defendants' current Motion dramatically touts the supposed newsworthiness of "steps" (falsely) reported in their article that "an elected judge like Judge Patrick, who aspired to a seat on the state's highest court," allegedly "took *in* her campaign for that office" (ECF No. 26-1, p. 24) — including being "QAnon-Linked" (ECF No. 23-1) — an article that, as Defendants put it now, was "about Judge Patrick's high-profile ruling in the Columbus statue case and described her *primary election* connections to QAnon" (ECF No. 26-1, p. 3). Of course, the irony is that the fact that Judge Patrick *was* in the midst of a campaign at the time of the alleged events reported in the article with regard to QAnon was among the multiple context-critical facts admittedly known to Defendants but that they either obscured or suppressed entirely to paint a knowingly false and scurrilous picture of Her

---

[4] Unless otherwise specified, all emphases herein are supplied.

[5] Defendants now seek to evade this plain-English, dictionary-definition meaning of the term they used in their article, and rather propose it be read in a way that, while still disparaging, is more limited: a "link" to persons and events that *are* "linked" to QAnon *in* that more fundamental sense; a reading that, at best, raises an ambiguity to be determined by a jury.

Honor (see, ECF No. 23, ¶¶ 34-36),[6] as further reviewed below; and the taint of the falsely asserted "QAnon-Link[]" certainly was not, in any event, limited under any reasonable reading of the article to the time of her "primary election"; it went, and continues to go, much deeper.

Defendants even chose to obscure, to the same end, the basic fact, also admittedly known to them, that Judge Patrick did **not** actually attend the alleged QAnon event, in any case. ECF No. 23, ¶¶ 11, 12, 25, 33, 35-36.[7]  Defendants further seek to obscure what actually happened in the preparation of this defamatory article by arguing about another alleged source article **not hyperlinked** (and therefore not relied upon) in the defamatory article, a 30 April 2021 Inquirer article[8] provides them no shelter, for its headline "Judge Disavows any Q'Anon Link" speaks for itself.

In sum, the Defendants' self-avowed **only** sources for the article were certain articles they have identified from other media outlets, attached as Exhibit "A," that do not address Q'Anon at all.  ECF No. 23, ¶¶ 27, 28, 29, 30, 31, 32, 33.  This, and the malice issues surrounding it, are more fully addressed in § IV.C. on malice.

---

[6] The article **only** mentions that Judge Patrick is "a Republican who unsuccessfully ran for a seat on the state Supreme Court earlier this year," but in no way makes clear or, indeed, indicates at all that the alleged "QAnon-affiliated event" (which she did not attend) and "interview with supporters of the conspiracy theory" actually occurred ***during*** that campaign. ECF No. 23-1. Also see, ECF No. 23, ¶¶ 34-36. The omitted context is critical because, of course, candidates for public office speak or are listed to speak at numerous events before various groups, as Judge Patrick did in her statewide campaign, and this is obviously **no** basis to attribute affiliation **or** any attachment or connection with any of them. Id.

[7] The article **only** reports that "***she*** denied that she ever **planned** to attend" the event, **only** to immediately interpose an "even though …" and, then, give (supposed) reasons that even ***that*** denial (the ***only*** one reported) should **not** be believed — that she "did an interview with supporters of the conspiracy theory" and "was listed as a speaker" at the event. ECF No. 23-1.

[8] Due to the defendants' arguments in their initial Motion to Dismiss, Judge Patrick included paragraphs 26 and 27 in the Amended Complaint to dispel any assertion that that article provides support for their defense, as it plainly does not.

## IV.    ARGUMENT

### A. Pertinent Standards

#### 1. On Pleading Generally

A motion to dismiss for failure to state a claim under Rule 12(b)(6) should be denied if under any "plausible" reading of the pleadings, the plaintiff would be entitled to relief. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A court may only grant such a motion "if, accepting all factual allegations as true and construing the complaint in the light most favorable to the plaintiff," the court determines that the plaintiff is not entitled to relief "under any reasonable reading of the complaint." McGovern v. City of Philadelphia, 544 F.3d 114, 115 (3d Cir. 2009). The court must "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010). Plaintiff can survive a motion to dismiss under Rule 12(b)(6) where the alleged facts are sufficient to "nudge [her] claims across the line from conceivable to plausible." Bell Atlantic Corp. v. Twombly, supra, 550 U.S. at 570.

#### 2. On the Law of Defamation/False Light

##### a. The Boundaries and Interplay Between Federal and State — Here, Pennsylvania — Law

As already noted, "although a defamation suit has profound First Amendment implications, it is fundamentally a state cause of action" (Tucker, supra, 237 F.3d at 284 (quoting, McDowell, supra, 769 F.2d at 945) — and how the law is formulated beyond the requirements of the First Amendment may differ significantly depending on the law of the state. The formulation in Pennsylvania has required recognition of the first provision of its own Constitution, as well, given that, as the Supreme Court of Pennsylvania has repeatedly stressed, "[t]he right to preserve one's reputation is contained in Article I,

section 1 of the Pennsylvania Constitution" (<u>Norton v. Glenn</u>, 860 A.2d 48, 58 n. 10 (Pa. 2004), <u>cert.</u>

<u>denied</u>, 544 U.S. 956 (2005)) — that, indeed, "the state charter places reputational interests on the

highest plane, that is, on the same level as those pertaining to life, liberty, and property" (<u>Am. Future</u>

<u>Sys., Inc. v. Better Bus. Bureau</u>, 923 A.2d 389, 395 n. 7 (Pa. 2007)) — and that "[t]he redress provided

under our body of substantive law" for vindication of this constitutional right "is an action in tort for

defamation" (<u>Sprague v. Walter</u>, 543 A.2d 1078, 1084 (Pa. 1988)). As that Court has made clear:

> The [<u>Sprague v. Walter</u>, <u>supra</u>] Court was keenly aware of the seesawing balance
> between the constitutional rights of freedom of expression and of safeguarding one's
> reputation: protection of one of those rights quite often leads to diminution of the other.
> Yet, in the quest to strike a balance between these two competing protections, our court
> cautioned that the freedom of expression should not be seen as dominant and the
> protection of reputation as inferior. We stressed that the right to protect one's reputation
> is not a second-class right, amenable to being pressed into oblivion by other
> constitutional provisions. We made it plain that "a person's interest in his or her
> reputation has been placed in the same category with life, liberty and property." <u>Id</u>. [at
> 1084]. (citations omitted). Thus, we concluded the constitutional interest in providing
> for the free flow of information was not so absolute that it granted "a license to the
> media to use information recklessly and/or maliciously to destroy the reputation of a
> citizen." <u>Id</u>. [at 1085]. Rather, a balance must be struck between these two constitutional
> rights.

<u>Norton</u>, <u>supra</u>, 860 A.2d at 58. Accordingly, "the protections accorded … by the U.S. Supreme Court to

the right of free expression in defamation actions … **demarcate the *outer boundaries*** of our

Commonwealth's free expression provision." <u>Id</u>. <u>See</u>, <u>also</u>, <u>Joseph v. The Scranton Times, L.P.</u>, 129

A.3d 404, 428 (Pa. 2015) (same).

### b. <u>Defamatory Meaning</u>

The pertinent federal constitutional requirement is, simply, this: "a statement on matters of

public concern must be provable as false before there can be liability under state defamation law"

(<u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 19 (1990)) — that is, it must "contain a provably false

connotation" (<u>id</u>. at 20), one "***sufficiently factual* to be *susceptible* of being proved true or false**." <u>Id</u>.

10

at 21. In this regard, it is also clear there is **no** "wholesale defamation exemption for anything that might be labeled 'opinion.'" Id. at 18 (1990). Also see, id. at 21. Accordingly, ***even*** statements that may be construed as opinion can only be protected, non-actionable opinion ***if*** based on fully disclosed, accurate, and accurately assessed facts. Id. at 18-19 ("[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, ***or*** if his assessment of them is erroneous, the statement may still imply a false assertion of fact").[9]

It is also well-settled under Pennsylvania law that, when the alleged defamatory statement has a potentially innocuous meaning in addition to a derogatory one, this obviously means it cannot be deemed incapable of defamatory meaning as a matter of law. MacElree, supra, 674 A.2d at 1054-55. See, also, e.g., Sprague v. ABA, 2001 U.S. Dist. LEXIS 18707, at *8-*9, 13-16 (E.D. Pa. Nov. 21, 2001). Yet, there is, of course, **no** possible innocuous meaning for the characterization of Judge Patrick as a "QAnon-Linked Judge." Similarly, while it is likewise clear under Pennsylvania law that "specific language may be defamatory even though the subject of the defamatory language is not the focus of the article," and, "[m]oreover, a publication may be sympathetic towards its subject overall while particular portions have a defamatory meaning" (MacElree, supra, 674 A.2d at 1054),[10] there is **no** question the subject of the defamatory language here **was** the focus of the article, and the article certainly was **not**

---

[9] Again, this Court has already held that "Defendants' characterization of Judge Patrick as 'QAnon-linked' ***is*** an actionable expression of fact" (ECF No. 21, ¶ 15) that "***may*** be proved as false" (id.) and is **not** opinion (id. at ¶ 16). It also bears repeating that, even assuming it were opinion, it still would not meet the predicates of protected opinion: Defendants certainly did **not** fully and accurately disclose and assess the 'bases' for that characterization, because there were none — as detailed above, context-critical facts that were admittedly known to them were either obscured or suppressed completely; and, as further reviewed infra in § IV.C., the only sources Defendants say they ***did*** rely on manifestly did **not** say what they tortiously did or provide any basis to, they did not come close.

[10] In a false light claim, as well, "'[l]iteral accuracy of separate statements will not render a communication 'true' where the implication of the communication as a whole was false.' [Restatement (Second) Torts § 652E *Cmt. b*]." Krajewski v. Gusoff, 53 A.3d 793, 807 (Pa. Super. 2012), appeal dismissed, 84 A.3d 1057 (Pa. 2014) (quoting, Santillo v. Reedel, 634 A.2d 264, 267 (Pa. Super. 1993).

11

sympathetic towards its subject overall, in any event.  And, of course, in a false light invasion of privacy claim, it does not even need to be defamatory to be actionable.  Bromhall v. Rorvik, 478 F. Supp. 361, 367 (E.D. Pa. 1979).

Plaintiff will return to the topic of defamatory meaning as needed, more specifically, in § IV.B.

### c. Actual Malice

It is fundamental to the law of Pennsylvania, as throughout the nation, that the subjective state of actual malice may be proven by (that is, inferred from) objective circumstantial evidence. See, e.g., Sprague v. Walter, 656 A.2d 890, 907 (Pa. Super. 1995), appeal denied, 670 A.2d 142 (Pa. 1996) ("[a]ny competent evidence can be used to establish actual malice. Herbert v. Lando, [441 U.S. 153, 164 n. 12 (1970)]. 'All the relevant circumstances surrounding the transaction may be shown,' including, inter alia, 'ill will or hostility between the parties.' Id. See also, Tavoulareas v. Piro, [817 F.2d 762, 789 (D.C. Cir. 1987)] (a libel plaintiff may prove the defendant's subjective state of mind through the cumulation of circumstantial evidence …"). Also see, e.g., Schiavone Const. Co. v. Time, Inc., 847 F.2d 1069, 1089-1090 (3d Cir. 1988) ("[a] plaintiff may 'rarely be successful in proving awareness of falsehood from the mouth of the defendant himself.' Herbert v. Lando, [supra, 441 U.S. at 170] … Therefore, objective circumstantial evidence can suffice to demonstrate actual malice"). (Footnote citations omitted). Accordingly, the forms of circumstantial evidence that may be used are broad and varied. In this regard,

> The defendant in a defamation action brought by a public official **cannot**, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, **for example**, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would put them into circulation.

12

St. Amant v. Thompson, 390 U.S. 727, 732 (1968).  See, also, Moore, supra, 240 Fed. Appx. at 468 (quoting, Celle v. Filipino Reporter Enterprises, Inc., 209 F.3d 163, 184 (2d Cir. 2000) (quoting, Liberty Lobby, Inc. v. Dow Jones & Co., 838 F.2d 1287, 1293 (D.C. Cir. 1988)) ("Actual malice can be shown '[t]hrough the defendant's own actions, or statements, the dubious nature of his sources, [and] the inherent improbability of the story [among] other circumstantial evidence").  And this is precisely why, per Krajewski, 53 A.3d at 809, that the implication of malice in the pleadings is sufficient to permit the case to proceed.

Thus, while a mere failure to investigate before publishing will not establish actual malice, "it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry" (Harte-Hanks Communications v. Connaughton, 491 U.S. 657, 668 (1989)), and "recklessness may be found," for example, "where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." Id. at 688 (quoting, St. Amant, supra, 390 U.S. at 732); Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072, 1089 (3d Cir. 1985) (same). See, also, Schiavone, supra, 847 F.2d at 1090 ("where the defendant finds **internal inconsistencies** or apparently reliable information that **contradicts** its libelous assertions, but nevertheless publishes those statements anyway, the New York Times actual malice standard can be met"); Franklin Prescriptions, Inc. v. The New York Times Co., 267 F. Supp.2d 425, 438 (E.D. Pa. 2003) (same).  That is more than adequately pled in the Amended Complaint.

### 1). On Defendants' Blatant Misrepresentations Regarding a Heightened Standard in Defamation-by-Implication Cases

Defendants state that, in Kendall v. Daily News Publ'g Co., 716 F.3d 82 (3d Cir. 2013), a case from the Virgin Islands that came to the Third Circuit on appeal after a trial, verdict, and j.n.o.v., the Court held that, to establish actual malice in a defamation-by-implication case, the plaintiff must "also"

show "that the defendant intended to communicate the implication plaintiff ascribes to the communication." ECF No. 26-1, p. 18. Yet, Defendants have seen fit to reproduce **only half of the rule** pronounced in <u>Kendall</u>, which, in full, stated that this "communicative intent" element of actual malice in defamation-by-implication cases "can be satisfied … by demonstrating that the defendant ***either*** intended to communicate the defamatory meaning ***or*** knew of the defamatory meaning and was **reckless** in regard to it." <u>Kendall</u>, <u>supra</u>, 716 F.3d at 90. <u>Also</u> <u>see</u>, <u>id</u>. at 92-93. In fact, the Court went to lengths to stress that the inclusion of an alternate component of recklessness — the very component **excised** by Defendants here — was dictated by U.S. Supreme Court precedent for ***any*** formulation of actual malice (<u>id</u>. at 90-92), and held that "[r]ecklessness is thus the outer limit of actual malice, which means that the communicative-intent element of actual malice in defamation-by-implication cases can be satisfied by **reckless disregard for the defamatory meaning** of a statement." <u>Id</u>. at 91.

***If*** applicable, this standard, too, would surely be met at bar — the caveat is needed because, under <u>Kendall</u> itself, it is **not** applicable. The Court there defined defamation-by-implication cases, to which it held this standard would apply, as follows: "[i]n defamation by implication cases, the alleged defamatory statement has two possible meanings, **one that *is* defamatory and one that is *not*** … These cases **differ** from ordinary defamation cases in which the alleged defamatory statement **has *only* a defamatory meaning**." <u>Id</u>. at 89. Of course, the statement here, that Judge Patrick is a "QAnon-Linked Judge," has **no** non-defamatory meaning, but ***only*** a defamatory meaning. Hence, the additional standard pronounced in <u>Kendall</u> for defamation-by-implication cases does not, under <u>Kendall</u>, apply.

Yet, even proceeding further, *arguendo*, to dispense the definition actually given in <u>Kendall</u>, and hypothetically extend its scope beyond its own self-stated remit, to apply as well to cases where there are ***alternative* defamatory** meanings to a statement, even then it obviously could **not** be applied to both — it is meant to provide some additional protection for defendants who used a term that has an

innocuous sense, and which they may have only meant **and** understood in that sense, not to provide a windfall to those who used a term that can only be defamatory and in more ways than one. So, in that hypothetical extension of Kendall, the question would become, to which defamatory meaning would the standard apply? To the plain-English one averred by Plaintiff, as defined in the dictionary, with 'linked' meaning part of, attached to or affiliated with, that sense? But that would seem to make no sense. Then to the strained meaning proposed by Defendants, 'only' linking Judge Patrick to persons or events that **were** linked to QAnon in that more fundamental sense? Even to pose the question, Plaintiff submits, is to illustrate again the fundamental incongruity of that standard here.

Notably, more than 20 years ago, Judge Yohn of this Court was faced with a defamation-by-implication situation as defined in Kendall — the term there, "fixer" in the phrase "lawyer-cum-fixer," had two potential connotations, only one of which was derogatory, though that was sufficient to present an ambiguity to be determined by the jury and, thus, to withstand defendant's motion to dismiss. See, Sprague v. ABA, supra, 2001 U.S. Dist. LEXIS 18707, at *8-*9, *13-*16. And what is interesting is that, later in that case, presaging Kendall by a decade, Judge Yohn had to formulate a standard for actual malice in that situation to apply **on summary judgment** (see, Sprague v. ABA, 2003 U.S. Dist. LEXIS 15518, at *12-*14 (July 21, 2003)), just as the Court in Kendall later would **post-verdict**; and, drawing on some of the same cases from some of the same Circuits as would Kendall,[11] adopted a similar standard, albeit phrased somewhat differently, providing that, "[w]here a plaintiff's defamation case depends on material that is capable of both defamatory and innocuous meanings," actual malice exists where "the defendant 'either deliberately cast its statements in an equivocal fashion in the hope of insinuating a false import to the reader, or that it knew or acted with reckless disregard of whether its

---

[11] Compare, Sprague v. ABA, supra, 2003 U.S. Dist. LEXIS 15518, at *13-*14, and Kendall, supra, 716 F.3d at 91.

15

words would be interpreted by the average reader as false statements of fact." Id. at *13-*14 (quoting,

Solano v. Playgirl, Inc., 292 F.3d 1078, 1084 (9th Cir. 2002)). Noting that this standard, again like any

formulation of actual malice, could be satisfied by objective circumstantial evidence (id. at *15-*16),

the Court held it was satisfied by the evidence adduced in discovery there:

> In their motion for summary judgment, defendants deny intending or even anticipating
> that readers of the Journal would interpret the term "lawyer-cum-fixer" in the
> defamatory way … Conversely, plaintiff contends that this defense is at odds with
> common sense since it is the expertise of authors and editors to know the meaning of
> words. More importantly, plaintiff presents objective circumstantial evidence from
> which a rational jury could conclude that by publishing the article in question,
> defendants acted with actual malice … The record presents several pieces of evidence
> that could support a jury finding that when defendants employed the label "lawyer-cum-
> fixer" they either deliberately cast this description in an ambiguous light in the hope of
> insinuating a false import to the reader, or that defendants knew or recklessly
> disregarded the possibility that its words would be interpreted by the average reader as
> false statements of fact.

 Sprague v. ABA, supra, 2003 U.S. Dist. LEXIS 15518, at *16-*17. (Internal citations and footnotes

omitted).[12] The well-pleaded averments of the Amended Complaint reviewed in § III., supra, and as

further discussed below in § IV.C, would more than amply support the same conclusion at this stage

under either formulation of this standard — as, later, will the evidence to be adduced in discovery —

*were* this standard applicable, though as shown above it is not.

---

[12]  Those "several pieces of evidence" were: that the article's author admitted in his deposition that he
looked up "fixer" in a dictionary and the defamatory meaning was among the definitions listed (id. at
*18), albeit "listed later as a colloquial meaning" (id. at *18 n. 9) — and, though it was unclear from
his testimony when he looked this up, "given the current posture of the case, it is a reasonable inference
in the non-movant's favor that it was prior to the publication of the article" (id.); that the article's editor
conceded in her deposition that she assumed the average reader of the Journal would be familiar with
both meanings, including the defamatory one (id. at *18-*19); that the Journal had previously published
articles containing words with the root "fix" in a defamatory capacity (id. at *19-*20); that the author
and editors chose not to include in the final version of the article modifying language that, in context,
would have stripped "fixer" of its defamatory capacity (id. at *21-*22); that they also omitted from the
final version additional information about plaintiff's experience (id. at *22); and that the author
admitted it would take time, and might even be impossible, to think of an accusation against a lawyer
more defamatory than that he or she is, in that derogatory sense, a fixer (id.).

**B. <u>The Plain-Meaning Sting of the Publication is Actionable</u>**

Again, the question is whether the language at issue is "provable as false" (<u>Milkovich</u>, <u>supra</u>, 497 U.S. at 19), "contain[s] a provably false connotation" (<u>id</u>. at 20) — that is, a "connotation" that "is sufficiently factual to be susceptible of being proved true or false." <u>Id</u>. at 21. And, again, not only is it clear the publication's assertion that Plaintiff is a "QAnon-Linked Judge" meets this standard, this Court has already ruled it has. <u>See</u>, ECF No. 21, ¶¶ 15-17.[13]

### 1. The Manifold Fallacies in Defendants' Challenge to the Plain-English, Dictionary-Definition Meaning of their Assertion that Judge Patrick is a "QAnon-*Linked* Judge"

Defendants deceptively recast Judge Patrick's position as contending "that the Article ***implies*** that she is 'part of' or an adherent of QAnon." Again, this is no implication, it is what the assertion that she is a "QAnon-Linked Judge" directly says, according to the plain-English, dictionary-definition meaning of the word "linked" and its root "link." <u>See</u>, ECF No. 23, at ¶ 7, ¶ 7 n. 3. Furthermore, although this Court, as already discussed, held she did not plead this meaning in her first Complaint, she now plainly has (<u>id</u>.); and this Court's above-quoted ruling that "Defendants' characterization of Judge Patrick as 'QAnon-linked' ***is*** an actionable expression of fact" that "***may*** be proved as false" (ECF No. 21, at ¶ 15) clearly encompasses this meaning, as well. <u>See</u>, <u>id</u>. (Defendants "described Judge

---

[13] Defendants state they "do not seek to relitigate" this Court's ruling in that regard (ECF No. 26-1, p. 11), but nonetheless suggest this Court overlooked their contention that it was opinion (<u>id</u>. at p. 12). As already noted, this Court did not overlook that contention, it rejected it. <u>See</u>, ECF No. 21, ¶ 16. Furthermore, for the reasons noted in § IV.A.2.b., <u>supra</u> — and as will be further shown in a slightly different context in § IV.C.1., below — ***even*** were it opinion it could not constitute protected opinion, in any event. Defendants also oddly revisit, here, the Court's finding rejecting Plaintiff's claim that the article further links Judge Patrick's "QAnon-Link[]" to her role and ruling in the Columbus statue case, discussed by Plaintiff in § II., above. Yet, the only point they raise that is not already addressed by Plaintiff above is a sweeping statement that "critiques of judicial decisions are" categorically "protected opinions," but the very case they cite for this says **nothing** of the sort (ECF No. 26-1, p. 13), at which point they retreat to that same supposed harbor of opinion based on (fully) disclosed (and accurate) facts (<u>id</u>.), which, again, can provide no harbor for them, in any respect, here.

Patrick as being QAnon-***linked***. That linkage is a factual assertion in its own right, connecting her to the QAnon movement in some way. Though the parties are likely to dispute what it means to be 'linked' to a group or ideology, the fact of being linked to something is not so vague as to be rendered unprovable as false. In addition, a person is either linked to something or not, even if that linkage might vary in degree. Because the fact of Judge Patrick's alleged 'link' to QAnon may be proved as false, she can maintain a false light claim based upon Defendants' characterization of her"). (Emphasis in original). See, also, id. at ¶ 16 ("[i]t's a factual assertion about a link to a particular group (even if that group is somewhat ill-defined")), and ¶ 17 ("it is plausible that it is false that [she] is QAnon-linked").

While this is dispositive at the threshold of Defendants' challenge to that meaning, Plaintiff will, nonetheless, also address the manifold substantive fallacies of that challenge, the first part of which purports to be based on the text of the article, while the second purports to be grounded in law.

The textual argument, such as it is, is that the part of the article about "an interview" of Judge Patrick (ECF No. 23-1) "describes her interviewers — but not her — as 'supporters of the conspiracy theory'" (ECF No. 26-1, p. 13). Yet, this overlooks the obvious: a reasonable reader would **not** read this — ***or*** the article's other supposed **example**, that "she was listed as a speaker" at "a QAnon-affiliated event" (ECF No. 23-1) — as refuting or lessening or limiting at all the plain-meaning of the already reported description of her as a "QAnon-Linked Judge," but as further ***supporting*** it. Beyond that, the argument devolves to various phrasings of the fact that the article reported Her Honor's denial that she ever planned to attend that event (ECF No. 26-1, p. 13)[14] — indeed, Defendants have the temerity to contend that "the Article takes pains to report that Judge Patrick disavowed any connection to the QAnon" (id. at p. 14). That contention, as the article itself attests, is laughable. See, ECF No. 23-1. Yet, even were it sound, the argument essentially proposes that a published smear must be read to

---

[14] If ***only*** to immediately cast doubt even on that denial, as already discussed above in § III.

disappear when the publication also reports some denial *by* the person smeared — albeit without in any way crediting it as true — that by the mere fact of being reported it is self-operative and controlling of the article's import, it supersedes everything. Needless to say, Defendants cite no authority for this proposition, or anything like it, because there is none; it is absurd on its face.[15]

The legal argument fares no better. Defendants first purport to rely on the proposition that the complained of language must be read in context with the entire article to determine if it is capable of defamatory meaning, citing, for this, the Supreme Court of Pennsylvania's decision in Thomas Merton Ctr. v. Rockwell Int'l Corp., 442 A.2d 213, 216 (Pa. 1981). That reliance fails for two reasons. First, that same Court, noting the same "proposition" in a later case, made clear it has limits (MacElree, supra, 674 A.2d at 1054) — those specified in that case being that "specific language may be defamatory even though the subject of the defamatory language is not the focus of the article," and that "a publication may be sympathetic towards its subject overall while particular portions have a defamatory meaning." Id.[16] Further, and fundamentally, it is of no aid to Defendants if the headline *is*

---

[15] Notably, in purporting to respond later in their submission to a contention Plaintiff has **not** made, but that is a straw-man of Defendants' own fabrication — that actual malice can be established based merely on the fact that the defamatory accusation was denied — Defendants state that "a publisher's decision not to credit a denial, 'however vehement,' cannot establish actual malice because denials 'are so commonplace in the world of polemical charge and countercharge that, **in themselves**, they hardly alert the conscientious reporter to the likelihood of error." ECF No. 26-1, pp. 20-21 (quoting, Harte-Hanks, supra, 491 U.S. at 691 n. 37. Of course, reports in articles that the subjects of their actionably defamatory assertions have denied them are also "commonplace," and likewise do not, "in themselves," keep them from being actionably defamatory. And see, e.g., Morgan v. Bulletin Co., 85 A.2d 869, 872 (Pa. 1952) ("[a]n astonishing number of people are convicted of charges they deny, and the denial does not set them right in the public mind. A denial often lends piquancy to the story, and printing one would be an easy escape from liability if that was all there was to it."

[16] See, also, e.g., Dunn v. Gannett New York Newspapers, Inc., 833 F.2d 446, 448-50 (3d Cir. 1987) (headline alone can be defamatory); Kaelin v. Globe Communs. Corp., 162 F.2d 1036, 1041 (9th Cir. 1998) (collecting cases). In fact, "the text of a newspaper article is ordinarily **not** the context of the headline, although it may explain or qualify a defamatory imputation conveyed when the headline alone is read. This is true because the public frequently reads only the headlines of a newspaper or reads the

read in the "context" of the full article, in any event: as already discussed, a reasonable reader would **not** read the supposed **examples** in the article as refuting or lessening or limiting at all the plain-meaning of the overarching description of her as a "QAnon-Linked Judge," but as further ***supporting*** it.

Finally,[17] although Defendants knew well-enough what QAnon was when they chose to brand Judge Patrick as "QAnon-Linked," they now contend it is somehow too vague for a charge that one is part of or affiliated with it to be actionably defamatory, indeed, that what they call political labels are as a whole too vague to be actionable, and that the same is true for a person's affiliations broadly, as these follow from personal traits that may not be as evident outwardly, physically, bodily, to be verified as easily as Defendants, at least for their purposes now, believe is due. All that is nonsense.

In the first place, again, this Court has already held the assertion that Judge Patrick is "QAnon-linked" — whatever the precise form or degree of that linkage — "is **not** so vague as to be rendered unprovable as false," but to the contrary "***is*** a factual assertion" that "***may*** be proved as false." ECF No. 21, ¶ 15. And, of course, all sorts of ascribed derogatory traits have been recognized as actionable, both by the U.S Supreme Court and under the law of Pennsylvania. See, e.g., Milkovich, supra, 197 U.S. at

---

article itself so hastily or imperfectly as not to realize its full significance." Dunlap v. Philadelphia Newspapers, Inc., 448 A.2d 6, 10 (Pa. Super. 1982) (quoting, Restatement (Second) of Torts § 563, comment d). Defendants' citation to Lavin v. New York News, Inc., 757 F.2d 1416 (3d Cir. 1985), does not help its cause. The **sole** issue there involved the (New Jersey) **fair report privilege**, which the Court held was applicable, but which it is not involved at all, nor its Pennsylvania counterpart, at bar. Moreover, even in that inapposite context, the Court confirmed that for the privilege to apply to a report on an official document, "[n]ot only must the report be accurate, but it must be fair … Thus, although it is unnecessary that the report be exhaustive, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who heard or read it, as **for example** … **the use of a defamatory headline** in a newspaper report, **qualification of which is found only in the text** of the article." Id. at 1419 (quoting, Restatement (Second) of Torts § 611, comment f).

[17] Laced throughout the defense arguments on this issue, as seemingly all issues, is the recycled contention that the characterization of Judge Patrick as a "QAnon-Linked Judge" is opinion — which, again, this Court has already ruled it is not — and that it is protected opinion, which it is not and could not be ***even*** were it opinion, for reasons already noted herein multiple times, and revisited in yet another context in § III.C., below.

18-19 (calling someone "a liar"); <u>Smith v. Wagner</u>, 588 A.2d 1308, 1311 (Pa. Super. 1990) (calling someone "a liar, a thief and a crook"); <u>Banonis v. Roney</u>, 2023 Pa. Super. Unpub. LEXIS 1060, at *14 (Pa. Super. May 1, 2023) (allegations that council-members had not only accepted a large sum of money from a special interest group but "would, without integrity, use their positions in the interest of the landfill and to the detriment of the Township," held capable of defamatory meaning).

Yet, there is an even more fundamental flaw in Defendants' position. Whether terms are or are not defamatory may shift over time, over historical eras. These are the sort of nuances that go wholly unappreciated in Defendants' selective string-cites of terms that have been found to be non-actionable — for example, calling someone a fascist, or a "fellow traveler" of "fascists." ECF 26-1, p. 16 (<u>quoting</u>, <u>Buckley v. Littell</u>, 539 F.2d 882, 894 (2d Cir. 1976)). Yet, they neglect to note that is **because** terms such as "fascist" **no longer have the meaning**, **or sting**, **they once did**:

> As for "fascism": Although, the word has a particular meaning in political science discourse, in the arena of political commentary it **has long been used** to describe nothing more specific than right-of-center views of which the writer disapproves … <u>See</u>, <u>Buckley</u>[, <u>supra</u>, 539 F.2d at 894].

<u>Liberty Lobby v. Anderson</u>, 746 F.2d 1563, 1573 (D.C. Cir. 1984), <u>reversed</u> <u>on</u> <u>other</u> <u>grounds</u> <u>in</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242 (1986). (Footnote omitted). The same is often true of calling someone a "Nazi," which in current discourse may mean no more than harshly domineering, dictatorial, intolerant; and, thus, may now be deemed no more than insulting but non-actionable name-calling. However, in the wake of World War II, when the memory of Nazism as a real danger to our country remained fresh, calling someone a "Nazi" **or** "pro-Nazi" **or** "a Nazi sympathizer" was actionably defamatory. <u>Christopher v. American News Co.</u>, 171 F.2d 275, 278 (7th Cir. 1948).[18]

---

[18] Similarly, although calling someone "a Mata Hari" today might be dismissed as more non-actionable name-calling, that was not always the case — not in 1952, for example, when the Supreme Court of Pennsylvania held that "[h]ad the article directly stated that plaintiff was a Mata Hari **there could be**

Obviously, "QAnon" has not undergone any such time-tempered change in common parlance. As already detailed, though it should not need to be, QAnon is a currently all-too-active fringe group, extremist and noxious, that, as shown repeatedly, including in the attack on the capitol on January 6, 2021, is a real danger to our country, to the very fabric of our democracy. And it is indisputable *that* is the QAnon, the currently active, extremist, and dangerous QAnon, to which Defendants were referring, by no means figuratively, in their article. Thus, there should be no question that, in *this* time, asserting someone is "QAnon-Linked" — whether this means part of or affiliated with QAnon or pro-QAnon or a QAnon sympathizer — is actionably defamatory. Cf., Christopher, supra.

### C. Plaintiff Has More than Amply Pleaded Facts to Establish Actual Malice

As intimated at the outset of this submission, the plausibly pleaded facts that sufficiently establish actual malice at this stage of the proceedings are really quite simple.

Instantly, those averments, reviewed specifically in § III., supra, confirm several context-critical facts admittedly known to Defendants but that they chose to obscure or suppress entirely in their article to falsely portray Judge Patrick as a "QAnon-Linked Judge." These include, not only that Judge Patrick did not, in fact, attend the "QAnon-affiliated event" referred to in the article, but that both that event, for which the article says "she was listed as a speaker," and the other supposed supporting example in the article — "an interview" it says she did "with supporters of the [QAnon] conspiracy theory" — occurred *while* she was running in a statewide campaign as a candidate for the Supreme Court of

---

**no doubt but that it would be a libel**," and further held that the article there, which did not state directly, but could reasonably be construed to imply that plaintiff, the vice-president of a parking-meter sales firm that was seeking a city contract, was the "Mata Hari of the parking meters," was also libelous. Morgan v. Bulletin Co., supra, 85 A.2d at 872. Another example would be calling someone a "crony" of a foreign leader or "supporter" of their government, as, although "[m]erely associating somebody with a foreign government would not ordinarily be defamatory," this would not be the case if the alleged association was with Slobodan Milosevic and his regime, tainted by war crimes, or with the government of South Africa during apartheid. Jankovic v. Int'l Crisis Group, 494 F.2d 1080, 1091 (D.C. Cir. 2007).

Pennsylvania. Of course, candidates for office, especially statewide office, give interviews with various persons and speak or are listed to speak at events with various groups, which alone would obviously be **no** basis to attribute affiliation with any such group, *or* even with any such event or interviewer.

So, what basis did Defendants have? **None**. And one of the well-pleaded points that establishes this for instant purposes is itself, Plaintiff submits, more than sufficient to compel the conclusion that she has plausibly pleaded actual malice: Defendants' *admit* their *only* sources for the article were certain prior articles by other media outlets they have identified, *none* of which, though, say what Defendants defamatorily said here, *or* anything like it; *none* of which provided **any** basis for their assertion that Judge Patrick is "QAnon-linked," that she is part of or affiliated with that group, *or* even with any event or person who was or is, at all. This is clear from the face of Defendants' self-proclaimed *only* sources, so Defendants necessarily *knew* those sources provided **no** basis to assert Judge Patrick is "QAnon-Linked," and, again, they admittedly had **no** other.

An argument buried at the very end of Defendants' Memorandum of Law (see, ECF No. 26-1, pp. 22-23) — that Plaintiff's position in this regard is fatally contradicted by what she averred in in a prior case about "the April *Inquirer* article" (id. at p. 22) — is buried there for good reason. As identified at the outset of this Response, this goes well beyond the fact that Plaintiff's position in that earlier case was hardly as simple as Defendants suggest.  Rather, the Defendants have persistently avowed, and indeed touted, as they continue to do now, that their sources were those prior media reports **hyperlinked** *in* **their article** — "the hyperlinks that enabled readers to see Ms. Bradley's sources." EFC No. 26-1, p. 14. Indeed, their Memorandum even provides a link to the article in its "online" form that "remains available," https://www.thedailybeast.com/qanon-linked-judge-rules-in-war-over-columbus-statue-and-plywood-box-in-philadelphia?ref=scroll, which "enables readers, as well as the Court, to access" those sources. ECF No. 26-1, pp. 7-8. More precisely, it "enables readers"

and "the Court" to see what Defendants acknowledge in a passing footnote here (id. at p. 9 n. 5), as they must: that April article is **not** among them. Thus, it is irrelevant to the issue of actual malice, which "focus[es] … on [Defendants'] state of mind at the time" of publication. Ralston v. Garabedian, 2022 U.S. Dist. LEXIS 153789, at *111 (E.D. Pa. Aug. 26, 2022). See, New York Times Co. v. Sullivan, 374 U.S. 254, 286 (1964); Dunn, supra, 833 F.2d at 450; Weaver v. Lancaster Newspapers, Inc., 926 A.2d 899, 905-06 (Pa. 2007).

Indeed, in a self-defeating attempt (as well as a plainly improper attempt to insert extrinsic evidence in a Motion to Dismiss) to establish that at least one of those articles did provide such a basis, Defendants block-quote this from an October *Inquirer* article:

> The judge, a Republican, faced criticism earlier this year when she was listed as a speaker at **a Gettysburg *event linked* to the QAnon conspiracy theory**. Patrick, however, said she never planned to attend the event and did not know why she was listed as a speaker.

ECF No. 26-1, p. 8 (quoting, article attached to Defendants' Motion as Ex. 6).

That description of the "***event***" (which Defendants knew she did not attend) as "***linked*** to the QAnon conspiracy theory" is the best Defendants can come up with as their 'basis' for asserting that ***Judge Patrick*** **is a** "***QAnon-linked Judge***" — and it does not come close.

This all confirms, more than amply for instant purposes, that Defendants published the core smear here **knowing** (but not caring) that they had **no basis** for it. As the authorities already reviewed attest, this is more than sufficient to show actual malice. And see, e.g., Moore, supra, 240 Fed. Appx. at 469 (defendant's "awareness that there was no basis for making the specific allegations of wrongdoing that were leveled against" plaintiffs, if proven, would establish actual malice).

**1. Again, Defendants' Purported "Reliance" on Sources — Here, Prior Articles by Other Media Outlets — Far from Precluding Actual Malice, Further *Proves* It**

This last argument by Defendants is facially specious for the reasons just delineated, above, which show that, far from precluding actual malice, Defendants' purported reliance on these sources — their admitted only sources — further **proves** it.

## V.   **CONCLUSION**

For all of the foregoing reasons, Defendants' Motion to Dismiss at bar is without merit and should be denied. Plaintiff prays this Honorable Court to so rule.

Respectfully submitted,

**THE BEASLEY FIRM, LLC**

By:    /s/ James E. Beasley, Jr.
James E. Beasley, Jr.
Dion G. Rassias
*Attorneys for Plaintiff,*
*The Honorable Paula A. Patrick*

Dated: 18 May 2023

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date set forth below, I caused a true and correct copy of the foregoing Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint to be served upon the following counsel *via* the Court's electronic filing system:

> Kaitlin M. Gurney
> Leslie Minora
> Ballard Spahr LLP
> 1735 Market Street, 51st Floor
> Philadelphia, PA  19103
> gurneyk@ballardspahr.com
> minoral@ballardspahr.com
>
> Seth D. Berlin
> Ballard Spahr LLP
> 1909 K Street NW, 12th Floor
> Washington, DC 2006-1157
> berlins@ballardspahr.com
>
> *Counsel for Defendants The Daily Beast*
> *Company LLC and Laura Bradley*

> /s/ James E. Beasley, Jr.
> James E. Beasley, Jr.

Date: 18 May 2023